180 So.2d 282

**Earl ROBINSON and Robert S. Moore**

v.

**STATE.**

**I Div. 56.**

Court of Appeals of Alabama.

Nov. 16, 1965.

Windell C. Owens, Monroeville, for appellants.

Richmond M. Flowers, Atty. Gen., and John D. Bonham, Asst. Atty. Gen., for the State.

**112**

JOHNSON, Judge.

Appellants, Earl Robinson and Robert S. Moore, were convicted in the Circuit Court of Monroe County of the offense of taking or attempting to take fish from the public waters of Alabama by means of an electrical device. This appeal is from the judgment of conviction, which is based upon a jury verdict.

Act No. 786, page 1384, Acts of Alabama 1951 (see Tit. 8, Sec. 79(1)) reads as follows:

"It shall be unlawful for any person to take, catch, stun or kill, or attempt to take, catch, stun or kill, any game or non-game fish by any means other than those which are expressly allowed by law or regulation of the department of conservation, in any of the public waters of this state.

"Any person who uses any electrical device or any other device or instrument capable of taking, catching, stunning or killing game or non-game fish, which is not expressly allowed by law or regulation of the department of conservation, shall be in violation of this section and such violation shall be punishable by a fine of not less than $50.00 nor more than $500.00. Any person convicted the second time of violating any of the provisions of this section shall be guilty of a misdemeanor and shall be punished by a fine of not less than $200.00 nor more than $500.00 and the court, at its discretion, may also impose a jail sentence of not longer than six months.

"The possession of any electrical device or any other device or instrument, on the bank of a public stream or other public body of water or in a boat on such water, which is capable of taking, catching, stunning or killing fish and which device or instrument is not expressly allowed by law or regulation of the department of conservation, shall be prima facie evidence that the device or instrument is being used illegally for the purpose of taking, catching, stunning or killing, or attempting to take, catch, stun or kill game or non-game fish."

Reasonable Rules and Regulations of the State Department of Conservation have the force and effect of law, and courts may take judicial knowledge of the same. West v. State, 30 Ala.App. 318, 6 So.2d 434, certiorari denied 242 Ala. 369, 6 So.2d 436. We have not found any regulations of the Department of Conservation which expressly allow the taking of fish from the public waters of this State by use of an electrical device.

Appellants' main contention was that the evidence was insufficient to sustain the verdict and that the State failed to establish the corpus delicti.

The State's evidence consisted of the testimony of Chester P. Gardner and W. A. Thames, the arresting officers. Both witnesses are conservation officers employed by the State Department of Conservation. Inasmuch as the appellant contends that the evidence is insufficient to sustain the verdict, we shall quote liberally from the testimony. Officer Gardner gave in part the following testimony on direct examination:

"Q. Where were [appellants] arrested Mr. Gardner?

"A. Just above what is known as Harris Bluff on the Alabama River.

"Q. Where is that sir in regard to the Claiburne Landing and the bridge that crosses the river at Claiburne?

"A. About eight miles below it.

"Q. Now Mr. Gardner what were the circumstances, and what do you know took place at the time these men were arrested?

"A. Approximately ten a. m. on that morning, Mr. W. A. Thames and another conservation officer and I were patrolling the Alabama River. And as we approached the place these men were, as we proceeded down the river we observed a boat in a pocket behind the Harris Bluff, one man was standing up and the boat was running slow. At that time we were travelling pretty fast and we eased over to where we were running under the tree line of the river trying to get as close to the boat as we could before being observed. But we were observed by the boat and when we came in roughly three or four hundred feet of it they was coming up the river and we turned out and went toward them. At that time they threw one object overboard which we couldn't identify. Next they threw over a telephone.

"Q. Now just a minute Mr. Gardner, you say they threw over a telephone, I want you to tell this petit jury what a telephone is. You and I know what it is but I want this jury to understand what you're talking about.

"A. Well this generator was attached, used on these old crank telephones they used to have hanging on the wall. And it produces a current when you crank it so much of sixteen hundred volts. And you can attach two wires to it, one which goes to the bottom and another one which just barely—

"Q. Now sir, you say the bottom—the bottom of what?

"A. Bottom of the river.

"Q. All right sir?

"A. And the other one is just dangling in the water and when you crank it the water between the two wires acts as a conductor bringing the current from the wire on the bottom back up to the wire that's in the water. Any fish that's in the area between those two wires are temporarily stunned and they come to the surface.

"Q. And how are they—what means do they use at that time to catch them after they come to the top?

"A. They use a dip net, however at times on big fish they use a gaff. But normally they use a dip net, a long handled dip net.

"Q. Now it's your testimony that you and Mr. Thames there saw a telephone rig thrown overboard?

"A. We saw a telephone box with a crank on it thrown overboard.

"Q. How close were you to it at that time?

"A. About fifty feet.

"Q. Now what if anything happened then please sir, right after that?

"A. Next they threw a fish—large catfish which in my estimation it would weigh between five and eight pounds, it was a large catfish. And next they unwound a piece of wire from the insulator on the back of the boat and threw it overboard. Mr. Moore was operating the boat and he wouldn't stop so we had to circulate him to get him to stop the boat. And finally he did stop and we arrested them for possession of a telephone on the Alabama River.

\* \* \* \* \* \*

"Q. What did they have to say there as they were arrested Mr. Gardner?

"A. They claimed they hadn't been telephoning.

"Q. And I'll ask you sir, were there any other objects there in the boat at the time they were arrested?

"A. We got a dip net, long handled dip net out of the boat, and we got the insulator off the back of the boat and some sacks in there that had had fish in them at one time.

"Q. Let me ask you sir, is this the insulator that was recovered there at that time?

"A. Yes sir, that is it.

"Q. Has that been in your possession continuously since that time?

"A. Yes sir.

"Q. Where was this in the boat?

"A. It was attached to a nail on the left rear corner.

"Q. Do you remember at that time whether or not the wire that you testi-

fied thrown over was wrapped around that insulator?

"A. Yes sir, they unwrapped it and threw it overboard.

\* \* \* \* \* \*

"Q. Now let me ask you this Mr. Gardner, what did they say their business was up and down that river?

"A. Just riding.

"Q. That place where you observed them throw this telephone rig over and this fish and where you recovered these things where they were arrested, is that in Monroe County, Alabama?

"A. Yes, sir, the river is the line there between Monroe and Clarke."

On cross-examination Officer Gardner testified as follows:

"Q. You know whether they—there's no way you could tell who put that insulator on there is it?

"A. No sir but—

"Q. Now normally in telephoning you wouldn't have any wire attached to any gadget like that anyway would you?

"A. Yes sir, you use it to keep from pulling the wire loose from the telephone when you are moving through the water. See your drag is dragging on the bottom.

\* \* \* \* \* \*

"Q. All right. What does these telephones usually consist of?

"A. Some of them are still in the original box—

"Q. Was this one still in the original box?

"A. Yes sir.

"Q. What kind of box is it?

"A. It's a square box with a door on it and the handle sticks out of the side.

"Q. Did you see this handle on this one?

"A. Yes sir I saw what I thought was the handle.

"Q. You saw what you thought was the handle. Now can you tell this jury here that there was anything inside of that box?

"A. No sir—

"Q. You can't tell them there was anything inside that box can you?

"A. No sir.

"Q. And you don't know whether that was a telephone then that they threw overboard or not do you?

"A. Yes sir it looked like a telephone.

"Q. It looked like it. But as far as you know there might not have been anything in that box that could have generated electricity, as far as you know? Is that correct?

"A. That's right."

Officer W. A. Thames testified on direct examination as follows:

"Q. Now Mr. Thames I want you to tell this petit jury what you saw down there take place the morning these people were arrested? What led to the arrest?

"A. Well we were patrolling the river and going down the river, and we saw the boat up next to the bank I believe it's Marshall Bluff there, right across from Mr. Deer's, that being right across from the old Gosport landing, and one man was standing up in the boat and as we approached them going down the river we decided to hold the left bank to keep from showing ourself as much as possible, and we got as close as we could on them and just before we approached them the boat pulled out and the man set

down, and so we saw them throw one object out and we went on—

"Q. You have any judgment what that first object was they threw over?

"A. —

"MR. OWENS: Unless he knows I object to it.

"Q. Go ahead sir.

"A. We got closer to them and then we saw them throw the telephone out and the fish and then unhook the wire and throw it in. They didn't want to stop for us. I stood up and motioned for them to stop and they tried to speed up the river and we had to circle them to get them to stop.

"Q. What did you see in the boat at the time?

"A. I believe a pair of pliers, bandage tape and one or two cornsacks, a dip net and this insulator. That's all that was in the boat.

\*    \*    \*    \*    \*    \*

"Q. Now that place where they were arrested and where you saw—let me ask you this—how close were you all to them please sir when you saw this object thrown over which you took to be the telephone?

"A. Approximately fifty feet. We were going down and they were coming up.

"Q. You know what that was?

"A. I know in my own mind what it was.

"Q What was it?

"A. A telephone.

"Q. And that's a device you use to take fish, non-game fish and game fish in the State of Alabama?

"A. That's right."

On cross-examination Officer W. A. Thames testified as follows:

"Q. Mr. Thames now you know in your own mind—can you swear that it was a telephone?

"A. As far as in the box no sir. I can't swear it was a telephone in the box."

On redirect examination Thames testified:

·"Q. You've sworn it was a box that had a crank on it haven't you?

"A. That's right.

"Q. Have you had occasion to see those rigs before?

"A. Yes sir.

"Q. And they are used with wires in combination with a dip net?

"A. Yes sir."

The appellants presented no evidence.

We find the following facts to be undisputed: Appellants had in their possession an old-fashioned, hand-cranked, wall telephone box. The crank was attached to the box. The box was thrown overboard as the arresting officers approached. The type of telephone ordinarily contained in such box is capable of generating a sufficient electrical current to stun fish and bring them to the surface of the water, where they may be easily taken by the "fisherman" using such device. Appellants disengaged a wire from an electric insulator on the back of their boat and threw the wire overboard as the officers approached. A dip net and a large catfish were found in appellants' boat. Appellants attempted to flee from the officers.

Appellants argue that the evidence was insufficient to establish guilt, or a prima facie case, because the arresting officers could not positively testify that a telephone was in the telephone box.

■■ The facts necessary to prove the corpus delicti as well as the guilt of the defendants may be by circumstantial evidence. See Newby v. State, 21 Ala.App. 353, 108 So. 272. We are of the opinion that the circumstances proved in the instant case are sufficient to sustain the conviction.

■ Any act proving or tending to prove an effort or desire on the part of a defendant to obliterate evidence of a crime is relevant, for from such fact, if unexplained, the jury may justly infer a consciousness of guilt. Montgomery v. State, 17 Ala.App. 469, 86 So. 132.

■ In a criminal case the flight or attempted flight of a defendant is a circumstance which the jury may take into consideration in determining guilt. See 6 Ala. Digest, Criminal Law, ☞ 351(3) for numerous authorities.

Under all the evidence the appellants were not due the affirmative charge, nor did the court err in overruling appellants' motion to exclude the evidence and motion for a new trial.

There being no error in the record, the judgment is due to be and the same is hereby

Affirmed.

CATES, Judge (concurring specially).

I do not want to be understood as placing any reliance on § 3 of Act No. 786 of September 11, 1951. This section reads:

"The possession of any electrical device or any other device or instrument, on the bank of a public stream or other public body of water or in a boat on such water, which is capable of taking, catching, stunning or killing fish and which device or instrument is not expressly allowed by law or regulation of the department of conservation, shall be prima facie evidence that the device or instrument is being used illegally for the purpose of taking, catching, stunning or killing, or attempting to take, catch, stun or kill game or non-game fish."

The principle of making one act evidence of the doing of something else is fraught with pitfalls. I certainly do not think the Legislature could make possession on a public highway of a motor car capable of going, say, eighty miles an hour to be prima facie evidence of a man's driving over sixty miles.

Here I consider the witnesses actually saw the defendant using an electrical device capable thereof in an attempt to stun fish in a public stream.